UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THOMAS STEELE,

    Plaintiff,

    v.                                                                    Civil Action No. 02-1420  (CKK)

DISTRICT OF COLUMBIA HOUSING
AUTHORITY, *et al.*,

    Defendants.

**MEMORANDUM OPINION**
(February 14, 2006)

Plaintiff Thomas Steele brings this action pursuant to 42 U.S.C. § 1983, the Fifth

Amendment of the Constitution, the Sixth Amendment of the Constitution, and common law,

alleging that Defendant the District of Columbia Housing Authority ("DCHA") (1) violated his

constitutional rights by condoning, promoting, and permitting the use of excessive force by one of its

police officers while placing Plaintiff under arrest, and (2) was negligent by failing to maintain a

manned security desk in the apartment building where he resided.[1]  Currently before the Court is

Defendant's Motion for Summary Judgment, contending that (1) the evidence adduced during

discovery shows that Plaintiff's arrest was routine and devoid of excessive force, and (2) there is no

evidence that Defendant's customs, policies, or procedures were the cause of Plaintiff's "injuries."

*See* Def.'s Mot. for Summ. J. at 1.  Upon a searching examination of Defendant's motion, Plaintiff's

---

[1] Special Police Officer Christopher Greene, the officer accused of actually employing the
excessive force in question, was originally a named Defendant in Plaintiff's Complaint.  *See* Compl.
at 1.  However, in a paperless Minute Entry dated December 15, 2003, the Court dismissed without
prejudice Defendant Greene from this case given Plaintiff's repeated failure to serve Defendant
Greene and file proof of service with the Court.  *See Steele v. Dist. of Columbia Housing Auth.*,
Civ. No. 02-1420 (D.D.C. Dec. 15, 2003) (Minute Entry Dismissing Defendant Greene).

Opposition, Defendant's Reply, the attached exhibits, and the entire record herein, the Court shall

grant Defendant's Motion for Summary Judgment *in toto*.

## I: BACKGROUND

During the time period relevant to this dispute, Plaintiff was a thirty-eight (38) year-old male

resident of a public housing complex owned and managed by the DCHA located at 1200 Delaware

Avenue, S.W., in the District of Columbia.  Compl. ¶¶ 7-8; Def.'s Mot. for Summ. J., Ex. 1

(11/11/04 Dep. of Thomas Steele ("Steele Dep.")) at 20, 22.  Plaintiff lived in a building reserved

for senior citizens and disabled tenants, Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep.) at 22-23, due

to a work-related back injury that occurred in 1995, *id*. at 10-13, and alleged post-traumatic stress

disorder arising from an encounter with a police officer in 1997, *id*. at 13-15.[2]  These injuries did

not disable Plaintiff to the extent that he needed a cane, walker, or a wheelchair, nor were they

severe enough such that Plaintiff was compelled to use any of the other handicapped devices

provided in each of the DCHA apartments in his residential building.  *Id*. at 23-24.  Despite the

comparatively minor nature of his disability, the DCHA assigned him to the Delaware Avenue

apartment complex in 2000 after he applied for low-income housing for the disabled.  *Id*. at 22.

The DCHA provides security for the residents of its apartment buildings, which includes

employing Special Police Officers ("SPOs") who have been trained at the Police Academy.  Def.'s

Mot. for Summ. J., Ex. 2 (12/16/04 Dep. of Melvin A. Bilal, Pl.'s Expert ("Bilal Dep.")) at 53-54.

---

[2] Specifically, while leaving a supermarket in 1997, Plaintiff was stopped by a police officer who suspected him of shoplifting; the officer then asked Plaintiff to open his coat so the officer could inspect its contents.  Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep.) at 13-15.  Upon finding no evidence of shoplifting, the officer apologized and allowed Plaintiff to exit the premises.  *Id*. at 13.  Plaintiff testified that he was embarrassed and humiliated by this experience; as a result, he reports that he suffers from post-traumatic stress disorder and major depression.  *Id*. at 17-18.  Plaintiff brought a separate lawsuit arising out of these events in District of Columbia Superior Court, which was ultimately unsuccessful.  *Id*.

The DCHA's SPOs are given alternating responsibilities to (1) conduct roving patrols of the properties assigned, or (2) remain at fixed posts and monitor the entrance of visitors and residents. *See* Def.'s Mot. for Summ. J., Ex. 4 (Special Post Orders); Def.'s Reply, Ex. 6 (DCHA Manual of Policy and Procedure).  The DCHA has issued a series of twelve (12) Special Post Orders to guide the performance and responsibilities of its SPOs, Def.'s Mot. for Summ. J., Ex. 4 (Special Post Orders), and has created a Manual of Policy and Procedure to further delineate the duties of its SPOs, Def.'s Reply, Ex. 6 (DCHA Manual of Policy and Procedure).  These Special Post Orders include, *inter alia*, Special Post Order #7, which applies specifically to the building in which Plaintiff resided.  Special Post Order #7 states:

> All entry doors will be closed and locked at 7:00 p.m.  Security personnel will not admit visitors to the building after 11:00 p.m., unless security has called the resident. Residents must provide a telephone number for the security personnel for notification of a guest visiting the resident.  After 11:00 p.m., residents who do not have telephones must come to the security post to sign in a guest.

Def.'s Mot. for Summ. J., Ex. 4 (Special Post Orders) at 1.  For visitors arriving prior to 11:00 p.m., Special Post Order #3 applies:

> Security personnel will require <u>all visitors to present a picture identification</u>.  The security guard and or monitor shall print the visitor's name in the Visitors Log and print the name of the tenant being visited . . . . Security personnel will verify that the name of the person being visited appears on the Building Tenant Roster.  Security personnel must check the name and signature on the identification against that provided in the Visitors Log.  All visitors must sign in and out.

*Id*. (emphasis in original).  Under DCHA policy, SPOs are to remain "at fixed posts and/or patrol their assignments as instructed by the roll call supervisor or by standing orders," and are not to "leave their assignments, except to process an arrest" unless they obtain "the approval of a DCHAPD supervisor, or for relief at the end of the shift."  Def.'s Reply, Ex. 6 (DCHA Manual of Policy and Procedure) at 2.

On February 9, 2001, between 10:30 p.m. and 11:00 p.m., Christine Jackson – Plaintiff's former girlfriend of over two years with whom he had recently broken up after an argument, Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep.) at 25 – arrived at Plaintiff's apartment.  Compl. ¶ 7; Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep.) at 29.  Plaintiff refused to answer Ms. Jackson's knock at his door, as he was in the apartment with another woman, Linda Fenwick, and had no desire to see Ms. Jackson.  Compl. ¶ 11; Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep.) at 29.  Faced with no answer, Ms. Jackson then went to the first floor of the building, checked the Visitors Log, and discovered that Ms. Fenwick had signed in at 9:30 p.m. to visit Plaintiff.  Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep.) at 30.  Ms. Jackson then returned to Plaintiff's apartment, and began banging on the steel door with a fire extinguisher – leaving several dents – and calling out Ms. Fenwick's name.  *Id.*

At this point, Plaintiff called the security guard's desk three times to request assistance, but received no response.  *Id.*  Plaintiff did not call the police department or 911, because – as he claimed during his deposition in this case – he had no desire to see Ms. Jackson arrested and only wanted her away from his premises.  *Id.*  Finally, concerned about the attention Ms. Jackson's efforts might attract and the peaceful environment typically enjoyed by his elderly neighbors, Plaintiff opened his door to Ms. Jackson.  Compl. ¶ 14; Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep.) at 31. According to Plaintiff:

> When she hit my door about two or three times, I had got really peed off by this time, cause I had just moved in not too long ago.  And like I say, I got elderly neighbors, and I didn't want all this attention around my door where people would look out and say what's going on . . . . So she was banging real loud, so that's what got me mad.  I got up and finally opened the door.

*Id.*  Ms. Jackson then entered his apartment and hit Plaintiff on the knee with the fire extinguisher.  *Id.*  Plaintiff reacted by placing his hands on Ms. Jackson's neck or throat, pushing her out of the apartment to the hallway floor, and locking his door.  Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep.)

at 31-34.

Roughly five-to-ten minutes later, Ms. Jackson returned to Plaintiff's apartment accompanied by DCHA SPO Christopher Greene. *Id.* at 35. Officer Greene was an experienced SPO who had been hired by the DCHA in 1997, and had taken over 360 hours worth of training courses in areas such as crimes against persons, crimes against property, the Metropolitan Police Department's Code of Ethics, and the use of force. *See* Def.'s Reply, Ex. 5 (Officer Greene's Official Training Transcript). Concerned about the marks around Ms. Jackson's neck, Officer Greene requested that Plaintiff open his door and step into the hallway. Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep.) at 35. Plaintiff promptly complied with Officer Greene's request. *Id.* According to Plaintiff:

> I stepped out, he grabbed me, slammed me up against my next door neighbor across the hall's door, I mean wall beside his door, and proceeded to handcuff me . . . . As soon as I stepped out [of] the door, he grabbed me and twisted me around and slammed me up against the wall, and told me to spread my legs and put my hands behind my back and handcuffed me.

*Id.* at 35-36; *see also id.* at 44-46 (noting that his back hurt for one week after this encounter with Officer Greene, and he later had arthroscopic surgery on the knee injured by Ms. Jackson). Officer Greene placed Plaintiff under arrest for assault and domestic violence based on Jackson's allegations that Plaintiff had assaulted her, as evidenced by the red marks on her neck. *Id.* at 35. Plaintiff and Ms. Fenwick attempted to explain to Officer Greene that Ms. Jackson had actually assaulted Plaintiff, but – according to Plaintiff's testimony – Officer Greene refused to accept his account. Compl. ¶ 15; Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep.) at 36. Officer Greene then walked Plaintiff outside and handed him over to Metropolitan Police Officers who took Plaintiff to the local Metropolitan Police Department where he was booked for assault and domestic violence. Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep.) at 38. At the same time, Ms. Jackson was transported to

D.C. General Hospital for treatment regarding the red marks around her neck.  Pl.'s Opp'n, Ex. 7

(DCHA 2/10/01 Arrest Report of Plaintiff).

In May 2001, after a bench trial, Plaintiff was acquitted of the charges of assault and battery

and domestic violence.  Compl. ¶ 19; Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep.) at 44.  In

making the acquittal determination, Judge Harold Cushenberry of the District of Columbia Superior

Court found that while Plaintiff had used significant force in expelling Ms. Jackson from his

apartment, injuring her neck in the process, Plaintiff's counter-force was reasonable in light of Ms.

Jackson's actions.  Pl.'s Opp'n, Ex. 20 (5/21/01 Tr. from Pl.'s Criminal Trial) at 40-42.  During the

criminal trial, SPO Cheryl Brown – one of the security guards typically stationed at the security

desk in his building – testified about her actions on the night of February 8, 2001.  Def.'s Mot. for

Summ. J., Ex. 1 (Steele Dep.) at 40-41.  According to Plaintiff, SPO Brown explained that she left

her shift at the security desk on February 9, 2001, when it ended at 11:00 p.m.  *Id.* at 40-42; *see*

*also* Pl.'s Opp'n, Ex. 10 (SPO Brown's Time-Sheet) (showing that she left work at 11:00 p.m. on

February 9, 2001).  In contrast, Plaintiff believes that she left her station early, between 10:30 p.m.

and 11:00 p.m., because his calls during that period to SPO Brown's desk went unanswered.  *Id.*

While the record is somewhat unclear on the exact time of SPO Brown's departure, the evidence

adduced during discovery does show that two different DCHA supervisors visited Plaintiff's

building during the shift following SPO Brown's departure, once at 11:40 p.m. and then again at

4:01 a.m.  *See* Def.'s Reply, Ex. 8 (Patrol Logs).  During discovery, Plaintiff also adduced evidence

that showed that the DCHA was aware of the occasional unmanned desk due to employee's leaving

their shifts early, but was working so that such problems could be avoided.  *See* Pl.'s Opp'n, Ex. 9

(4/13/99 Memorandum by Sgt. Winkey summarizing a Resident Counsel Meeting, addressing the

problem, and notifying tenants that he would do everything he could to resolve it; 2/8/00

Memorandum by Sgt. Gatewood addressing the concern again, providing tenants with his cell phone number if the desk went unmanned, and promising that he would make personal random checks to ensure that the officers and monitors assigned to the posts adhere to the DCHA's Post Orders; 3/14/00 Memorandum by Sgt. Gatewood stating that security stations should be manned at all times and again providing his cell phone number so that residents could contact him in the event of an unmanned desk).

Following his criminal trial relating to the events of February 9, 2001, Plaintiff filed a civil action in this Court on February 16, 2002.  *See* Compl. at 1.  Plaintiff's Complaint alleges three separate counts.  In his first count, Plaintiff claims that the DCHA, along with Officer Greene and several unnamed, never identified, never served Doe Defendants, violated his Fifth Amendment rights:  (1) by "collud[ing] with each other [] in order to avoid liability for the injuries Plaintiff sustained because the building was left unguarded" and "the use of excessive force committed by [Officer] Greene" such that Plaintiff was criminally prosecuted "in the face of overwhelming evidence of Plaintiff's innocence," *id*. ¶ 25; and (2) by having "established custom[s], practice[s] and procedures promulgated [] or permitted" that ensured that SPOs such as Officer Greene were improperly hired, trained, and supervised, Pl.'s Opp'n at 8-11.  *See* Compl. ¶¶ 23-28 (Count I–Violation of the Fifth Amendment and 42 U.S.C. § 1983).  In his second count, Plaintiff contends that his Fourth Amendment rights were violated when the DCHA's employee – Officer Greene – employed excessive force against him upon Plaintiff's arrest.  *Id*. ¶¶ 29-33 (Count II–Violation of the Fourth Amendment and 42 U.S.C. § 1983); *see also* Pl.'s Opp'n at 11-15.  In his third and final count, Plaintiff asserts that the DCHA was negligent in the performance of its duties "that required [it] to maintain a secure building, manned by security guards for the safety of the disabled and the elderly tenants at the apartment building where Plaintiff resided."  *Id*. ¶¶ 34-39 (Count

7

III–Negligence).  In light of these allegations, Plaintiff requests an award of compensatory damages

in the sum of $1,500,00.00 and punitive damages in the sum of $3,500,000.00.  *Id.* ¶¶ 28, 33, 39.

## II: LEGAL STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, bears the

"initial responsibility of informing the district court of the basis for [its] motion, and identifying

those portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of

material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986).  Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his]

own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific

facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary

judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d

202  (1986).  To be material, the factual assertion must be capable of affecting the substantive

outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible

evidence that a reasonable trier-of-fact could find for the nonmoving party.  *Laningham v. U.S.

Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505

(the court must determine "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  "If

the evidence is merely colorable, or is not sufficiently probative, summary judgment may be

granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted). "Mere

allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper

motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The

adverse party must do more than simply "show that there is some metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of

identifying those portions of the record that demonstrate the absence of a genuine issue of material

fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is

a *genuine issue for trial*.'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in

original).

### III: DISCUSSION

The Court shall begin its analysis of the DCHA's Motion for Summary Judgment by first

examining Defendant's arguments with respect to Count II of Plaintiff's Complaint (Violation of the

Fourth Amendment), as the Court's analysis regarding the alleged "excessive force" employed by

Officer Greene will have an impact on its Fifth Amendment custom, practice, and procedure

findings. Second, the Court shall turn to Defendant's arguments with respect to Count I of

Plaintiff's Complaint (Violation of the Fifth Amendment), regarding Defendant's alleged

"collusion" and assertions that the DCHA improperly hired, trained, or supervised its SPOs such as

Officer Greene. Finally, the Court shall consider Defendant's arguments with respect to Count III of

Plaintiff's Complaint (Negligence), regarding the DCHA's alleged negligence in failing to properly

maintain a manned security guard desk on the night in question.

A.      *Count II – Fourth Amendment/Excessive Force*

A citizen who alleges that he or she has been subjected to an unreasonable search or seizure, or excessive force in the course of an arrest or seizure in violation of the Fourth Amendment, may seek redress under Section 1983. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Section 1983 provides, in relevant part:

> Every person who, under color of [state law] subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Given that the DCHA is the only remaining Defendant in this case, as Officer Greene was dismissed from this suit due to Plaintiff's failure to serve, Plaintiff's task is a bit more complicated.

First, Plaintiff must establish that Officer Greene actually employed excessive force against him in violation of the Fourth Amendment during his arrest on February 9, 2001. In determining whether an arrest or seizure is reasonable, "[t]he touchstone of [the court's] analysis . . . [is] the reasonableness in all circumstances of the particular governmental invasion of a citizen's personal security." *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *see also Graham*, 490 U.S. at 396, 109 S.Ct. 1865. This analysis requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (internal quotation omitted). The test is an objective one, made "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

> In assessing the reasonableness of an act, a court must allow "for the fact that police officers are often forced to make split-second judgments – in circumstances that are

> tense, uncertain, and rapidly evolving – about the amount of force that is necessary
> in a particular situation."

*DeGraff v. Dist. of Columbia*, 120 F.3d 298, 301-02 (D.C. Cir. 1997) (quoting *Graham*, 490 U.S.

at 397, 109 S.Ct. 1865).  Importantly, "[t]he Fourth Amendment is not violated by an arrest based

on probable cause, even though the wrong person is arrested," *Graham*, 490 U.S. at 396, 109 S.Ct.

1865 (citing *Hill v. California*, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971)), and "[n]ot

every push or shove, even if may later seem unnecessary in the peace of a judge's chambers"

violates the Fourth Amendment, *id.* (citation and internal quotation marks omitted).  An officer will

be held liable only if the force used was so excessive that no reasonable officer could have believed

in the lawfulness of his actions.  *See Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993), *cert.*

*denied*, 512 U.S. 1204, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994).

Second, assuming that Plaintiff can make a showing that excessive force was used in his

arrest, he must then establish the liability of the municipal defendant – the DCHA.  A municipality,

such as the District of Columbia, may be held liable under Section 1983 "only when the execution

of its official policy or custom is responsible for the deprivation of constitutional rights."  *Morgan v.*

*Dist. of Columbia*, 824 F.2d 1049, 1058 (D.C. Cir. 1987); *see also Daskalea v. Dist. of Columbia*,

227 F.3d 433, 441 (D.C. Cir. 2000).  Courts "have consistently refused to hold municipalities liable

under a theory of *respondeat superior*."  *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403-04,

117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("Locating a 'policy' ensures that a municipality is held

liable only for those deprivations resulting from the decisions of its duly constituted legislative body

or of those officials whose acts may fairly be said to be those of the municipality."); *see also Triplett*

*v. Dist. of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) ("Although *Monell* allows claims

based upon a well-settled municipal custom . . . plaintiff 'must show fault on the part of the city

based on a course its policymakers consciously chose to pursue[.]'") (citation omitted); *Atchinson v. Dist. of Columbia*, 73 F.3d 418, 420 (D.C. Cir. 1996) (municipality can be held liable only if it is "itself responsible for an unconstitutional deprivation of rights"). To prevail on his Section 1983 Fourth Amendment claim against the DCHA, Plaintiff "must show a course deliberately pursued by the city, 'as opposed to an action taken unilaterally by a nonpolicymaking municipal employee,' and 'an affirmative link between the [city's] policy and the particular constitutional violation alleged.'" *Carter v. Dist. of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986) (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

Upon an examination of the events of February 9, 2001, it is plain that Plaintiff's excessive force claim is without support, and the DCHA's Motion for Summary Judgment must be granted as to Count II of Plaintiff's Complaint. Four considerations animate this finding.

     1.    <u>Officer Greene Did Not Use "Excessive Force" During the Arrest</u>

First, the facts as asserted by Plaintiff and adduced during discovery do not establish an "excessive force" Constitutional violation as a matter of law. Rather, Plaintiff merely describes a routine arrest scenario. According to Plaintiff, after he pushed Ms. Jackson out of his apartment, she then left the hallway, located SPO Greene, and reported that Plaintiff had choked her and left visible marks on her neck. Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep.) at 18, 35. Under these circumstances, Officer Greene was justified in investigating the situation, coming to Plaintiff's apartment, and – if he deemed it necessary – arresting Plaintiff. The fact that Officer Greene spun Plaintiff around and pushed him against the wall while making the arrest was reasonable under the circumstances. In fact, Officer Greene's actions represent a typical maneuver in an arrest situation, as police officers routinely push suspects against the wall when placing handcuffs on them, and they are often not particularly gentle about it – particularly where a suspect has been accused of violence,

some evidence supports that accusation, and the threat exists that the suspect may become violent

again.  Indeed, the Supreme Court has "long recognized that the right to make an arrest or

investigatory stop necessarily carries with it the right to use some degree of physical coercion or

threat thereof to effect it."  *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (citing *Terry*, 392 U.S. at 22-

27, 88 S.Ct. 1868).

     Here, Plaintiff does not allege that he was beaten or struck by Officer Green; rather, Plaintiff

claims only that "he [SPO Greene] grabbed me and twisted me around and slammed me up against

the wall, and told me to spread my legs and put my hands behind my back and handcuffed me."

Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep.) at 36.  Given that Plaintiff suffered no significant

physical injury other than being temporarily "slammed" against a wall while being handcuffed, the

Court concludes that the amount of force used by Officer Greene was clearly not excessive, and was

certainly reasonable under the circumstances.  *See Rogala v. Dist. of Columbia*, 161 F.3d 44, 54-55

(D.C. Cir. 1998) (no excessive force where arresting officer pulled passenger out of car, bruising her

arm, hitting her head against the car's interior, and causing a black eye); *Scott v. Dist. of Columbia*,

101 F.3d 748, 759-60 (D.C. Cir. 1996) (no excessive force where arresting officers grabbed suspect

by the pants, forced him to the ground, and handcuffed him); *Martin v. Malhoyt*, 830 F.2d 237

(D.C. Cir. 1987) (no excessive force even where arresting officer allegedly brutally grabbed driver

by waist, threw him back into the driver's seat, and slammed the door on his legs).  As noted by the

*Graham* Court, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a

judge's chambers," violates the Fourth Amendment.  *Graham*, 490 U.S. at 396, 109 S.Ct. 1865

(citation and internal quotation marks omitted).

     Plaintiff attempts to escape this conclusion by claiming that Officer Greene's actions were

unreasonable in light of the fact that he was a disabled individual living in public housing

specifically designed for the disabled.  *See* Pl.'s Opp'n at 12.  Plaintiff's argument fails in light of

the fact that Officer Greene's actions towards him were objectively reasonable, and a reasonable

officer could have believed in the lawfulness of his actions.  *See Wardlaw*, 1 F.3d at 1303.  At the

time of the events in question, Plaintiff was a thirty-eight (38) year-old man with no visible physical

problems – his only disabilities being a bad back and alleged post-traumatic stress disorder.  Def.'s

Mot. for Summ. J., Ex. 1 (Steele Dep.) at 23.  Plaintiff does not use a cane, a walker, or a

wheelchair, nor does he use any of the handicapped equipment supplied in his apartment.  *Id.* at 23-

24.  Accordingly, it was reasonable for SPO Greene, having heard Ms. Jackson's complaints of

being assaulted and having seen red marks around her neck, to assume that Plaintiff was capable of

inflicting bodily harm despite the fact that he was technically "disabled" and that he would be wise

to use caution and reasonable force to avoid bodily harm in approaching Plaintiff.  Indeed,

Plaintiff's own expert testified that there is a significant possibility for danger in a domestic dispute.

Def.'s Mot. for Summ. J., Ex. 2 (Bilal Dep.) at 37.  While Plaintiff now claims that Officer Greene's

actions aggravated his existing back injury and the knee injury inflicted by Ms. Jackson, two points

are evident:  (1) Plaintiff's existing back injury would not have been evident to Officer Greene, and

Plaintiff himself admitted that his back was sensitive following the incident for only approximately

one week and required no additional medical attention, Def.'s Mot. for Summ. J., Ex. 1 (Steele

Dep.) at 44-46, and (2) any injury to Plaintiff's knee inflicted by Ms. Jackson would have been her

responsibility – not Officer Greene's – and Officer Greene could not have known of this injury,

which occurred minutes before his arrival and was not part of the reason for which Plaintiff was in

the housing complex.  Ultimately, Officer Greene's actions in spinning Plaintiff around, forcing him

against a wall, and handcuffing him would have appeared reasonable to an objective officer, as

Officer Greene's restrained but forceful tactics were directed solely at effectuating the arrest and

limiting the danger to himself and Ms. Jackson.  Because the force applied by Officer Greene was

not objectively unreasonable, Plaintiff's Fourth Amendment "excessive force" claim in Count II of

his Complaint must fail.

> 2.  Plaintiff Has Produced No Evidence of an Official DCHA Policy Custom or Decision that Tolerates or Promotes Excessive Force

Even assuming *arguendo* that Plaintiff could establish that Officer Greene somehow

employed excessive force, his Fourth Amendment "excessive force" claim against the DCHA would

still fail given that he has not identified any DCHA policy, custom, or official decision that was

followed by the officer which resulted in the implementation of excessive force.  *See* Def.'s Mot. for

Summ. J., Ex. 2 (Bilal Dep.) at 40-51; *id.*, Ex. 3 (Pl.'s Answers to Def.'s First Set of Interrogs.) ¶

18.  To the contrary, Plaintiff's expert witness testified that the DCHA General Orders regarding

arrests, search and seizure, and the use of force are consistent with the applicable standard of care for

police officers around the country.  Def.'s Mot. for Summ. J., Ex. 2 (Bilal Dep.) at 40-50.

Accordingly, Plaintiff has offered no evidence that DCHA maintains any unconstitutional policy

regarding use of force, and has provided evidence through his own expert that its policies are

consonant with the applicable standard of care.  As such, Plaintiff has not and cannot establish that

the alleged excessive force was the result of an official DCHA custom, policy, or order.  *See Monell*

*v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Accordingly, summary judgment in favor of the DCHA on Plaintiff's Count II would still be

appropriate even if the officer himself had used excessive force.

> 3.  Plaintiff Has Offered No Evidence of an Unconstitutional *De Facto* Policy

For the sake of completeness in the record, the Court notes that Plaintiff asserts no claim and

provides no evidence that there was a *de facto* policy where the DCHA unofficially approved of the

use of excessive force.  *See generally* Compl.   Rather, Plaintiff merely proffers that Officer Greene

used excessive force against him on February 9, 2001.  *Id.*  Assuming *arguendo* that there was an

incident of excessive force, Plaintiff has failed to adduce evidence and offer argument regarding

other incidents where agents of the DCHA used excessive force in effectuating arrests on the

premises of DCHA buildings.  As the Supreme Court has held,

> Proof of a single incident of unconstitutional activity is not sufficient to impose
> liability [against a municipality] under *Monell*, unless proof of the incident includes
> proof that it was caused by an existing, unconstitutional municipal policy, which
> policy can be attributed to a municipal policymaker . . . . [W]here the policy relied
> upon is not itself unconstitutional, considerably more proof than the single incident
> will be necessary in every case to establish both the requisite fault on the part of the
> municipality, and the causal connection between the "policy" and the constitutional
> deprivation.

*Tuttle*, 471 U.S. at 823-24, 105 S.Ct. 2427.  By limiting his focus to the single incident at issue,

Plaintiff has failed to establish an essential element of a *de facto* policy claim – i.e., that the DCHA

unofficially consented to the use of excessive force.  Accordingly, to the extent that Count II of

Plaintiff's Complaint can be construed to encompass a *de facto* policy claim, summary judgment in

the DCHA's favor must be granted.

4.   Plaintiff Offered No Evidence that the DCHA Inadequately Trained Its
Officers

Once again, assuming *arguendo* that Officer Greene had used excessive force in arresting

Plaintiff on February 9, 2001, Count II of Plaintiff's Complaint could be construed as a claim that

the DCHA inadequately trained its officers in the use of force.  *See* Pl.'s Opp'n at 13-14.

Essentially, Plaintiff's "failure to train" claim revolves around the assumption of his expert – who

has never served as a police officer, Def.'s Mot. for Summ. J., Ex. 2 (Bilal Dep.) at 9-10 – that

because Officer Greene "failed" to comply with the DCHA General Orders requiring a verbal

warning before the use of force, then he must not have been trained properly, *id.* at 51-52.  Upon a

review of the evidence adduced during discovery, it is clear that such a claim is wholly without merit.

Importantly, a government entity cannot be held liable merely because one of its employees applies a constitutional policy in an unconstitutional manner. *See City of Canton v. Harris*, 489 U.S. 378, 387, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Rather, the proper inquiry is whether the training provided – or lack thereof – amounted to a "deliberate indifference" to the rights of the people with whom the officer came into contact. *Id*. at 388-89, 109 S.Ct. 1197. Moreover,

> [i]n resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.

*Id*. at 390-91, 109 S.Ct. 1197 (citations omitted). Finally, "for liability to attach in this circumstance[,] the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id*. at 391, 109 S.Ct. 1197. "For suits alleging failure to train or supervise, plaintiffs must also establish that the need for more or different training or supervision was so obvious and the inadequacy so likely to result in a violation of constitutional rights that policymakers could be said to have been deliberately indifferent to the need." *Rogala*, 161 F.3d at 56. "In so ruling, the [*Canton*] Court left no doubt that 'deliberate indifference' requires a high level of fault." *Dorman v. Dist. of Columbia*, 888 F.2d 159, 163 (D.C. Cir. 1989).

Plaintiff's "failure to train" argument falls into the classic scenario that the *City of Canton* Court sought to prevent. Here, Plaintiff's own expert testified that Officer Greene – like all SPOs employed by the DCHA – received police training at the Metropolitan Police Department's Police Academy, and that this training was appropriate and consistent with his knowledge of the training of

17

Police Officers within the District of Columbia and in other jurisdictions.  Def.'s Mot. for Summ. J.,

Ex. 2 (Bilal Dep.) at 52-54.  Indeed, the evidence adduced during discovery indicates that Officer

Greene graduated from the Police Academy after three months of training in 1997, and – during that

time – received 363 hours worth of training, which included, *inter alia*, relevant courses in

"MPD/Code of Ethics/EEO/Field Notebook-Report Writing," "Crimes Against Persons," "Crimes

Against Property," "Law of Arrest, Search and Seizure/Rules of Evidence/Investigative

Techniques," and "Use of Force."  *See* Def.'s Reply, Ex. 5 (Officer Greene's Official Training

Transcript).  Plaintiff's expert also admitted that the DCHA's General Orders, which are provided to

its SPOs, regarding arrests, search and seizure, and use of force are consistent with the applicable

standard of care for police officers around the country.  Def.'s Mot. for Summ. J., Ex. 2 (Bilal Dep.)

at 40-52.  Moreover, Plaintiff has made no objection to the contents of and policies set out in the

Manual of Policy and Procedure for SPOs created by the DCHA for its Officers.  *See* Def.'s Reply,

Ex. 6 (DCHA Manual of Policy and Procedure).

        As such, the Court is faced with a situation where Plaintiff can point to no specific aspect of

Officer Greene's particular training or the DCHA's training process for SPOs in general that was

insufficient or inadequate.  At most, Plaintiff assumes that Officer Greene's training must have been

faulty given his "improper actions" – i.e., pushing Plaintiff against a wall and refusing to listen to

his side of the story.  Def.'s Mot. for Summ. J., Ex. 2 (Bilal Dep.) at 51-52.  Even assuming

*arguendo* that Officer Greene's actions were improper (contrary to the Court's previous finding, *see*

*supra* Section III(A)(1)), Plaintiff has failed to prove that his *training* was flawed.  As the Supreme

Court has stressed, "adequately trained officers occasionally make mistakes; the fact that they do

says little about the training program or the legal basis for holding the city liable."  *City of Canton*,

489 U.S. at 391, 109 S.Ct. 1197.  Here, Plaintiff has not precisely identified what was "inadequate"

18

about the significant training provided and procedures outlined to Officer Greene, nor has he established that this "inadequacy" was "so obvious" that it can be said that the DCHA's policymakers were "deliberately indifferent" to the needs and rights of its tenants. *See Rogala*, 161 F.3d at 56. Instead, the record shows that the DCHA provided its SPOs with a significant amount of training over an extended period of time, and reinforced that training through its own Manual of Policy and Procedures. Even if Officer Greene somehow applied "excessive force," contrary to his training and in violation of the DCHA's guidelines, Plaintiff has failed to show that such "excessive force" was the result of the DCHA's "deliberate indifference" as to its training process, and has failed to evince a causal link between any flaws within the training and the injury that he suffered. As such, Plaintiff cannot prove the "high degree of fault" required by the Supreme Court in *City of Canton*, *see Dorman*, 888 F.2d at 163, and the DCHA is entitled to summary judgment with respect to Plaintiff's "failure to train" claim arising out of Count II of Plaintiff's Complaint.

      B.      *Count I – Fifth Amendment/Collusion and Improper Hiring, Training, and Supervision*

In contrast to Plaintiff's Fourth Amendment claims in Count II of his Complaint, which place the focus on Officer Greene himself, Plaintiff's Fifth Amendment claims in Count I of his Complaint place the spotlight on a variety of actors in addition to Officer Greene. Plaintiff, in Count I, essentially makes two separate claims. First, Plaintiff alleges a "violation of Plaintiff's Fifth Amendment Rights arising from collusion of supervisory official[s] to charge Plaintiff with a crime to cover up their failure to provide adequate supervision, training, and hiring of the security forces at the building in question" – a "failure [that] led to Plaintiff's injuries." Pl.'s Opp'n at 7. Second, Plaintiff alleges that (1) the DCHA improperly trained Officer Greene, not only in his arrest technique, as described *supra* Section III(A)(4), but also in the correct investigation of domestic

disturbances; (2) the DCHA "failed to properly supervise, train and hire Security Personnel" such as

the resident monitors stationed at the security guard desks and Officer Greene himself, leading to

Plaintiff's "injuries." *Id.* at 9. Because the Court has already determined that Officer Greene did

not use unconstitutional "excessive force" in the arrest of Plaintiff on February 9, 2001, *see supra*

Section III(A)(1), Plaintiff's Fifth Amendment claim must fail as an initial matter, as Plaintiff has

suffered no legally cognizable injury. However, assuming *arguendo* that Plaintiff could prove such

an injury, the Court shall deal with each individualized claim in turn.

1.     <u>Plaintiff Has Offered No Evidence of Unconstitutional Collusion</u>

Upon a review of Plaintiff's argument and the evidence adduced during discovery, it is clear

that the only evidence Plaintiff offers to support his claim of collusion between Officer Greene, other

unnamed security guards, and several unnamed, unidentified "high placed officials" in the DCHA,

Compl. ¶ 25; Def.'s Reply, Ex. 7 (Pl.'s Answers to Def.'s First Set of Interrogs.) at 2 (Interrog. #20)

(putting off the identification of these individuals), is the report documenting his actual arrest that

was signed by SPO Greene and a DCHA Police Supervisor less than two hours after his arrest on

February 9, 2001. *See* Pl.'s Opp'n at 8; *id.*, Ex. 7 (DCHA 2/10/01 Arrest Report of Plaintiff).

Plaintiff fails to explain how this report amounts to collusion, other than to simply assert that the

signature "validated the arrest of Thomas Steele and subsequent prosecution for a crime he did not

commit." Pl.'s Opp'n at 3.

An analysis of the report in question shows that the report merely lists the circumstances of

Plaintiff's arrest, including Ms. Jackson's claims that Plaintiff grabbed her by the neck and threw

her down, and the fact that she had red marks on her neck and was transported to the District of

Columbia General Hospital via a DCFD ambulance. Pl.'s Opp'n, Ex. 7 (DCHA 2/10/01 Arrest

Report of Plaintiff). Importantly, none of these facts are disputed by Plaintiff, and the accuracy of

the report itself is basically uncontested.  The Court finds it difficult to discern how this routine

report – which accurately describes the facts surrounding Officer Greene's decision to arrest Plaintiff

– supports Plaintiff's allegation that highly placed officials within the DCHA secretly "colluded" to

arrest him in order to cover up the fact that the front desk was likely not manned at the time of the

incident.  Indeed, there is no evidence in the record that anyone at the DCHA other than Officer

Greene knew of this incident until *after* Plaintiff's arrest.  The attached report itself is a standard

PD-251 form used to document every arrest.  The fact that Officer Greene's supervisor signed the

report after the fact does not amount to collusion; if Plaintiff's theory held, then every arrest would

be evidence of collusion.

Moreover, the Court notes that the DCHA was not the agency that actively prosecuted

Plaintiff upon his arrest; rather, a wholly separate and independent agency – the United States

Attorney's Office – made the reasoned decision to expend its resources and criminally prosecute

Plaintiff for the events arising on February 9, 2001.  While Judge Cushenberry made certain

credibility determinations in the criminal trial and found that, in light of the overall circumstances,

Plaintiff should not be convicted of assault and battery, his analysis supported Ms. Jackson's claims

and Officer Greene's concerns that Ms. Jackson had been forcibly grabbed around the neck by

Plaintiff and flung from his apartment.  *See* Pl.'s Opp'n, Ex. 20 (5/21/01 Tr. from Pl.'s Criminal

Trial) at 40-42.  Judge Cushenberry made no reference to or finding of collusion resulting in

Plaintiff's arrest.  Ultimately, Judge Cushenberry's analysis supports the reasonableness of

Plaintiff's arrest, i.e., Ms. Jackson had been physically injured at the hands of Plaintiff, but – as

noted – his decision relies on the fact that the evidence presented by Ms. Jackson was simply

insufficient to sustain a criminal conviction for what could very well have been self-defense by

Plaintiff.

Ultimately, Plaintiff has cited to no evidence indicating any collusion in his arrest and

prosecution.  Plaintiff makes no connection between the so-called "collusion" and a policy, practice,

or custom of the DCHA as required by *Monell*.  In the absence of any affirmative evidence to prove

his claim of collusion, summary judgment in favor of the DCHA on this point is appropriate.

*Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548.

    2.    <u>Plaintiff's Hiring, Training, and Supervision Claims Must Fail</u>

In addition to his claim of unlawful collusion, Count I of Plaintiff's Complaint – while not

explicit – could also be read to encompass a claim that the DCHA violated the strictures of the Fifth

Amendment by improperly hiring, training, and supervising its SPOs – including Officer Greene and

the Resident Monitors who are typically stationed at the security guard desks in its facilities.  *See*

Compl. ¶¶ 23-28 (Count I – Violation of the Fifth Amendment and 42 U.S.C. § 1983); Pl.'s Opp'n

at 9 ("Defendant, DCHA, failed to properly supervise, train and hire Security Personnel which lack

[sic] led to the injuries sustained.").  The Court shall deal with each subsection of Plaintiff's

apparent Fifth Amendment allegation in turn.

    i.    *Failure to Properly Hire Security Personnel*

Plaintiff, while he does not develop this argument in any length in his Opposition, asserts

that (1) "Special Police Officer Green [sic] was improperly hired and improperly screened before

[being] hired," Pl.'s Stmt. of Mat. Facts ¶ 4, and (2) the DCHA "failed to properly . . . hire Security

Personnel," which led to his injuries on the night of February 9, 2001, Pl.'s Opp'n at 9.  The only

evidence Plaintiff cites to support this theory of "improper hiring" is his expert's assumption that

"based upon his – Officer Greene's conduct, I question whether or not a person like Officer Greene

should have been hired," Pl.'s Opp'n, Ex. 4 (Portion of Bilal Dep.) at 69, and Officer Greene's

employment records, which relate an incident in January 2002 – nearly one year *after* the events in

question in this case – where Officer Greene was involved in a physical confrontation with another

SPO for which he was terminated, Pl.'s Opp'n, Ex. 5 (2002 Employment Records of Officer

Greene).  Plaintiff cites to no evidence suggesting that other "Security Personnel," such as Officer

Brown or any other security guard desk Resident Monitor was improperly hired.

      As the Supreme Court has noted,

> Where a plaintiff presents a § 1983 claim premised upon the inadequacy of an
> official's review of a prospective applicant's record, however, there is a particular
> danger that a municipality will be held liable for an injury not directly caused by a
> deliberate action attributable to the municipality itself.  Every injury suffered at the
> hands of a municipal employee can be traced to a hiring decision in a "but-for"
> sense:  But for the municipality's decision to hire the employee, the plaintiff would
> not have suffered the injury.  To prevent municipal liability for a hiring decision
> from collapsing into *respondeat superior* liability, a court must carefully test the
> link between the policymaker's inadequate decision and the particular injury alleged.

*Brown*, 520 U.S. at 410, 117 S.Ct. 1382.  "[T]he risk from a single instance of inadequate screening

is not 'obvious' in the abstract; rather, it depends upon the background of the applicant."  *Id.*

Moreover, "[t]he fact that inadequate scrutiny of an applicant's background would make a violation

of rights more *likely* cannot alone give rise to an inference that a policymaker's failure to scrutinize

the record of a particular applicant produced a specific constitutional violation."  *Id.* at 410-11, 117

S.Ct. 1382 (emphasis in original).  "[A] finding of culpability cannot depend on the mere probability

that any officer inadequately screened will inflict any constitutional injury.  Rather, it must depend

on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the

plaintiff."  *Id.* at 412, 117 S.Ct. 1382 (emphasis in original).

      Under these stringent standards, it is evident that Plaintiff cannot establish that the DCHA

was "deliberately indifferent" in its hiring process.  Here, with respect to "Security Personnel" other

than Officer Greene, Plaintiff adduced no evidence during the discovery process regarding DCHA's

hiring practices whatsoever, nor did he request such evidence.  Plaintiff simply has not produced a

scintilla of evidence (1) establishing the actual contours of the DCHA's hiring process, and (2) showing that the screening process was flawed in some way. Absent supporting facts regarding the DCHA's hiring methodology and its alleged flaws, no reasonable jury could conclude that the DCHA was "deliberately indifferent" during its hiring process. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (an unsubstantiated allegation is insufficient to avoid summary judgment, and a party must produce supporting facts). With respect to the specific hiring of Officer Greene, even assuming for the sake of argument that a single, solitary improper hiring – in the absence of any proven systemic flaws – *could* lay the basis for municipal liability, Plaintiff has failed to show that the decision to hire Officer Greene was flawed. In fact, Plaintiff falls into the trap clearly outlined by the Supreme Court in *Brown*, where his expert assumes *ex post facto* that because Officer Greene "mistreated" Plaintiff, he must have been improperly hired. *See* Pl.'s Opp'n, Ex. 4 (Portion of Bilal Dep.) at 69. Such an "assumption" is insufficient to show that this particular officer was likely to produce this specific kind of injury against an individual, or that the DCHA's hiring process was constitutionally infirm. Moreover, Plaintiff's citation to a 2002 incident between Officer Greene and another SPO is irrelevant to this analysis as well: Plaintiff has pointed to no evidence regarding any such "issues" with Officer Greene before the events of February 9, 2001, and events occurring after that date and after his hiring have no impact on whether the decision to *hire* Officer Greene was proper. Given these failings, the Court concludes that summary judgment in favor of the DCHA on Plaintiff's apparent "improper hiring" claim is appropriate.

ii.     *Failure to Properly Train*

To the extent that Count I of Plaintiff's Complaint can be read to encompass a claim that Officer Greene was improperly trained not only because he used excessive force, but also because he

"was negligent in the manner in which he conducted the investigation of the alleged domestic

violence charges levied against Plaintiff," Pl.'s Stmt. of Mat. Facts ¶ 5, the Court finds that such a

claim is barred under the same reasoning articulated by the Court in Section III(A)(4).  To the extent

that Count I could also be read to encompass a claim that security guard desk Resident Monitors

were improperly trained because there were instances where residents complained of unmanned

security posts, *see* Pl.'s Stmt. of Mat. Facts. ¶ 7, such a claim is barred by the reasoning articulated

by the Court in Section III(A)(4).

     Ultimately, the DCHA provided its SPOs with extensive training, a detailed Manual of

Policy and Procedure, and Special Post Orders.  Plaintiff has offered no evidence that this training

fell below the applicable standard of care.  Simply because the security desk was apparently

unmanned at the precise moment Plaintiff called on February 9, 2001, does not entail that the

DCHA was "deliberately indifferent" in its training process.  Moreover, to the extent that Plaintiff

may claim that the DCHA's prior awareness that the occasional unmanned security desk occurred,

Plaintiff cannot establish that the DCHA had a "policy" tacitly approving of unmanned security

desks.  Rather, all evidence shows that this was contrary to explicit DCHA policy, and the DCHA

actively prevented this from becoming a *de facto* policy by frequently meeting with residents about

the issue, seeking ways to circumvent any such problems in the future, and promising to engage in

more affirmative hiring steps.  *See* Pl.'s Opp'n, Ex. 9 (Memoranda from DCHA Officers

Responding to Unmanned Desk Problem).  The DCHA did not make a conscious choice or exhibit

"deliberate indifference" to the occasional unmanned desk; the DCHA was aware of the problem

and actively making efforts to rectify it.  This is not an instance of a municipality turning a blind eye

while people's rights were violated; instead, the DCHA was doing the best it could to resolve an

occasional problem.  As such, the Court finds that Plaintiff's Fifth Amendment "failure to train"

claims are without support, and summary judgment in favor of the DCHA on this point is in order.

          iii.    *Failure to Properly Supervise*

While not explicitly set forth in Count I of Plaintiff's Complaint, Plaintiff – in his Opposition – has attempted to expand his Fifth Amendment claim against the DCHA to include a claim that Defendant failed to properly supervise its "Security Personnel." *See* Pl.'s Opp'n at 9-10. According to Plaintiff, "the Supervision of Security Personnel was totally inadequate and in violation of the standard of care in that there existed a DCHA Policy that allowed only random checks on security personnel resulting in a supervisor exercising supervision every 3-4 days." *Id.* Plaintiff cites his expert's testimony for the fact that "the standard of care requires a supervisor to exercise supervision of security posts one hour of every eight hour shift." *Id.* at 10 (citing Pl.'s Opp'n, Ex. 26 (Portion of Bilal Dep.) at 77-78).

Several problems exist to undermine Plaintiff's apparent "failure to supervise properly" claim. First, Plaintiff never identifies any specific DCHA policy that allowed for only random checks on security personnel "resulting in a supervisor exercising supervision every 3-4 days." Plaintiff cites no evidence in the record or any specific written or *de facto* DCHA policy supporting such a claim. *See* Pl.'s Opp'n, Ex. 26 (Portion of Bilal Dep.) at 77 (Plaintiff's expert merely states that "the only thing that I saw in all of the material is that they mentioned that they had random supervisor rounds of those buildings"). Second, Plaintiff's claim is factually inaccurate, at least as it applies to the night of February 9, 2001. The record plainly states that two different DCHA supervisors visited Plaintiff's building during the shift in question, once at 11:40 p.m. and then again at 4:01 a.m. *See* Def.'s Reply, Ex. 8 (Patrol Logs). Based upon the criteria laid out by Plaintiff's expert, the DCHA complied with the applicable standard of care on the night of February 9, 2001, and therefore there can be no causal link between any "failure to supervise" and Plaintiff's "injury."

Third, Plaintiff has failed to connect any "lack of supervision" of the "Security Personnel" stationed in and around his building with his eventual "injury"; simply, Plaintiff has adduced no evidence showing "but for" greater supervision, his "injury" would have been averted. Accordingly, the Court concludes that summary judgment in the DCHA's favor is appropriate on this point, as no evidence suggests that the DCHA had a policy of "deliberate indifference" with respect to the supervision of its Officers.

C.      Count III – Negligence

Plaintiff's final claim against the DCHA flows from Count III of his Complaint, which alleges that "Defendant was negligent in its failure to man the security desk on the night in question." Pl.'s Opp'n at 15. With this claim, Plaintiff shifts the attention from Officer Greene to Ms. Jackson herself, the individual who injured his knee with a fire extinguisher during their confrontation. According to Plaintiff, the DCHA's Rules, Regulations, and Orders governing its security forces provided for twenty-four (24) hour security desk monitors to be in attendance at the building in question. *Id.*, Ex. 29 (Portion of Bilal Dep.) at 25. According to Plaintiff, his calls to the security desk went unanswered because Officer Brown left her 3:00 p.m. to 11:00 p.m. shift early and her replacement officer called in sick but the DCHA took no action to provide for a substitute desk monitor. *Id.* at 16. Showing a keen eye for rhyme, Plaintiff argues that "[h]ad the policy as written been enforced, Plaintiff would not have been injured by a woman he had broken off his relationship with two weeks before the event. A woman who obviously had an ax to grind with Plaintiff with criminal mischief in mind." *Id.* at 18.

Under District of Columbia law, "[a]s a general rule, a private person does not have a duty to protect another from a criminal attack by a third person." *Kline v. 1500 Massachusetts Ave. Apt. Corp.*, 439 F.2d 477, 481 (D.C. Cir. 1970); *see also Doe v. Dominion Bank of Washington*, 963

F.2d 1552, 1558 (D.C. Cir. 1992) (same).  However, "the rationale of this very broad general rule falters when it is applied to the conditions of modern day urban apartment living."  *Id*.  As such, the D.C. Circuit in *Kline* "consequently declared it the duty of residential landlords to exercise reasonable care to protect tenants from foreseeable criminal conduct in common areas of the leased premises, *i.e.*, areas exclusively within the landlord's control."  *Doe*, 963 F.2d at 1558-59 (citing *Kline*, 439 F.2d at 481).  While declining to "define the limits of a landlord's liability to prevent, deter, or control criminal conduct around or within the leased premises," the D.C. Court of Appeals has held that:

> [t]he traditional duty of reasonable care under all circumstances would, of course, apply to those parts of the building used in common by all tenants where it can be shown that the landlord was aware of a dangerous situation and took no action either to remedy the situation or warn the tenants of the danger.

*Ramsay v. Morrissette*, 252 A.2d 509, 512 (D.C. 1969).  The D.C. Court of Appeals has applied these principles in the context of residential leases.  *See Graham v. M & J Corp.*, 424 A.2d 103, 105 (D.C. 1980); *see also Doe*, 963 F.2d at 1560 (applying these principles in the context of a commercial lease as well).  In evaluating the landlord's conduct, "[w]hat measures are reasonable under the circumstances is determined by a jury assessment of protective measures taken in buildings of similar character and class."  *Id*. at 106.

However, "[i]t is axiomatic that under a negligence regime, one has a duty to guard against only foreseeable risks."  *Doe*, 963 F.2d at 1560.  The D.C. Court of Appeals has stressed that "[f]oreseeability is the key element in establishing the landlord's duty."  *Graham*, 424 A.2d at 105. Importantly, "D.C. law imposes a heightened standard of foreseeability on plaintiffs seeking to hold a landlord liable for injuries resulting from a criminal act."  *Doe*, 963 F.2d at 1560 (citing cases). "[T]his heightened showing does not require previous occurrences of the particular type of harm, but

can be met instead by a combination of factors which give defendants an increased awareness of the danger of a particular criminal act." *Dist. of Columbia v. Doe*, 524 A.2d 30, 33 (D.C. 1987). Factors that are relevant under this "combination of factors" analysis include "the condition of the premises," which is "the critical factor," and other evidence such as "[t]he reputation of a neighborhood as a high crime area" and "statistics on criminal activity in the environs surrounding the site of an assault." *Doe*, 963 F.2d at 1560-61. A landlord's obligation decreases where he has no knowledge – nor ought to have knowledge – of any danger. On the other hand, a tenant's responsibility to control their own safety increases when they are aware of special circumstances against which they ought to guard. *Kline*, 439 F.2d at 485.

In order to determine whether a negligent act or omission is the proximate cause of the cause-in-fact of a person's injury, courts within the District of Columbia apply the "substantial factor" test set forth in the Restatement of Torts. *See, e.g., Ashford v. Dist. of Columbia*, 306 F. Supp. 2d 8, 15 (D.D.C. 2004); *Dist. of Columbia v. Carlson*, 793 A.2d 1285, 1288 (D.C. 2002); In the Restatement, the term "substantial" is used to "'denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable [persons] to regard it as a cause.'" *Ashford*, 306 F. Supp. 2d at 15 (quoting RESTATEMENT (SECOND) OF TORTS § 431, comment a (1965)). While "[t]here is no legal requirement . . . that a defendant's negligence be the only substantial factor in bringing about the harm," "[a] defendant may not be held liable for harm actually caused where the chain of events leading to the injury appears 'highly extraordinary in retrospect.'" *Id.* (quotation marks and citations omitted).

Based upon these standards and the evidence adduced during discovery, the Court concludes that a reasonable jury could not conclude that the DCHA's alleged negligence in failing to maintain a fully-manned security desk caused Plaintiff's injury inflicted by Ms. Jackson. Rather, Plaintiff's

claim fails due to lack of foreseeability and lack of proximate cause.  Eschewing the issue of
whether the DCHA's security patrols, orders, and customary procedures in place ensured that it took
reasonable care under the circumstances, these two failings doom Plaintiff's negligence claim.

First, as noted, it is the landlord's duty to take security measures within its power to
minimize foreseeable risks to tenants.  *Kline*, 439 F.2d at 487.  In this case, Ms. Jackson was not an
unknown outside intruder from whom the residents of the building required protection.  Rather, she
and Plaintiff had been dating for over two years, they had broken up only two weeks prior to the
incident at issue, and she had visited Plaintiff's apartment over ten times and spent the night on
multiple occasions.  Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep.) at 26-27.  It is uncontested that
Ms. Jackson did not enter the building to commit a crime; instead, she came simply to visit Plaintiff.
*Id.* at 30.  The dispute that ensued between Plaintiff and Ms. Jackson, resulting in Plaintiff's injured
knee, was not a criminal act that the DCHA – as a landlord – should have reasonably foreseen.  The
event in question, a heated quarrel between two individuals who had recently had a romantic
relationship, was not within the DCHA's power to control.  Because the DCHA did not have any
reason to believe that the apparent assault would occur, it had no obligation to protect against such
an event.  *See Kline*, 439 F.2d at 485, 487.

Second, and more importantly, Plaintiff has failed to offer any evidence that the DCHA's
alleged negligence in failing to man the security desk caused his injury.  Plaintiff testified with
certainty that Ms. Jackson arrived at his apartment between 10:30 p.m. and 11:00 p.m.  Def.'s Mot.
for Summ. J., Ex. 1 (Steele Dep.) at 29.  Plaintiff also contends that Officer Brown, the security
guard desk officer on duty, left her shift early before its scheduled termination at 11:00 p.m.  *Id.* at
41-42.  As such, his argument is that the absence of a desk monitor enabled Ms. Jackson to enter the
building unannounced thereby leading to his assault and subsequent arrest.  Pl.'s Opp'n at 18.

30

Plaintiff contends that if someone had been at the front desk, they could have responded to the situation in a more efficient manner by calling an SPO and/or going to the apartment themselves to remove Ms. Jackson before things escalated as they allegedly did.  Def.'s Mot. for Summ. J., Ex. 2 (Bilal Dep.) at 27, 65.  Such an argument is without support.

In this case, it was ultimately irrelevant whether the front desk was manned prior to 11:00 p.m.  If Ms. Jackson arrived between 10:30 p.m. and 11:00 p.m., as Plaintiff testified, then she would have been able to enter the building unannounced whether or not someone was at the front desk.  *See* Def.'s Mot. for Summ. J., Ex. 4 (Special Post Orders) (Compare Special Order #3 with Special Order #7).  A visitor arriving at the building prior to 11:00 p.m., as Ms. Jackson did, was not announced to the resident; rather, they simply had to show identification, sign the Visitors Log, and the security guard at the desk had to make sure that the individual that they were allegedly visiting was actually on the list of residents.  *Id.*  As such, even if a guard had been stationed at the guard desk when Ms. Jackson entered the apartment building, Ms. Jackson – arriving before 11:00 p.m. – still could have reached Plaintiff's apartment door in an unannounced manner.  Accordingly, a reasonable person could not find that defendant's alleged breach of duty had such an effect as to actually produce the resulting harm to Plaintiff.  *See* RESTATEMENT (SECOND) OF TORTS § 431. Additionally, Plaintiff has failed to provide evidence that if someone at the front desk had been there to answer his phone calls for help, the end result would have been different.  Had a security guard been stationed at the desk, received his call, and called for security, SPO Greene would presumably have been the officer summoned, as he was on duty and stationed across the street.  Given that it is pure speculation to argue that SPO Greene would have arrived any quicker or handled the situation differently in that context, the fact that there may not have been a front desk clerk at the time Plaintiff called did not have such an effect as to produce the resulting harm.  *Id.*  Ultimately, the

31

DCHA's "negligence" was not a "substantial factor" in Plaintiff's resulting injury based on the uncontested facts of this case.

The evidence is clear that the DCHA was not the proximate cause of Plaintiff's injury.  It is uncontested that once Ms. Jackson began denting his steel door with a fire extinguisher, it was Plaintiff himself who unlocked the door, opened it out of anger and embarrassment, and affirmatively allowed Ms. Jackson to enter the previously secure apartment.  *See* Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep.) at 31-34.  Plaintiff was aware of the individual at the door, had intimate knowledge of her past behavior and mental processes, and was aware that she was reacting to the situation in a violent manner; despite this knowledge, Plaintiff consciously chose to roll the dice and open his apartment to a potential outside assailant armed with a metal fire extinguisher.  Here, Plaintiff had the option to (1) call the police or 911;[3] (2) call Sgt. Gatewood of the DCHA, who had given the building's residents his cell phone number in the event of an emergency, *see* Pl.'s Opp'n, Ex. 9 (2/8/00 and 3/14/00 Memoranda by Sgt. Gatewood); or (3) remain barricaded behind his secure steel door.[4]  Despite these three clear options, Plaintiff instead chose to open his door to Ms. Jackson.  Plaintiff is charged with the responsibility of protecting himself in such a situation, as he alone is the only individual with the special awareness of the surrounding circumstances.  *See Kline*, 439 F.2d at 485.  Indeed, "but for" Plaintiff's decision to open the door to an apparent threat,

---

[3] Plaintiff has stated that he did not call the police or 911 because he did not want Ms. Jackson arrested.  Def.'s Mot. for Summ. J., Ex. 1 (Steele Dep). at 30 ("I didn't want the girl arrested or anything, I just wanted her to get away from my door.  I wanted security to escort her away from my door.").  Nowhere does Plaintiff substantiate his assumption that a DCHA SPO would not have arrested Ms. Jackson while a police officer would have chosen to arrest her.

[4] A review of the attached pictures of the dented apartment door reveals that while marks are present on the door, Ms. Jackson would have had no hope of successfully "knocking down" the door, as her efforts had made no significant impact on the door.  *See* Pl.'s Opp'n, Ex. 30 (Pictures of Plaintiff's Door).

no injury or arrest would have followed.

Given the fact that Plaintiff's injury could not have been foreseeable in these circumstances and the DCHA was not the actual or proximate cause of Plaintiff's injury at the hands of Ms. Jackson, no reasonable jury could conclude that the DCHA's failure to maintain a fully-manned security desk contravened its duty of care to Plaintiff and other residents.  Because Plaintiff has failed to adduce evidence that would allow a reasonable jury to find that the DCHA was negligent in its conduct, summary judgment in DCHA's favor must be granted with respect to Count III of Plaintiff's Complaint.

## IV: CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted.  An Order accompanies this Memorandum Opinion.


Date:   February 14, 2006


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge